UNITED STATES of America

v.

Sidney MOURNING, et al.

Crim. No. A–88–CR–115(1)–(4).

United States District Court,
W.D. Texas,
Austin Division.

June 23, 1989.

Mark H. Marshall, U.S. Attorney's Office, Austin, Tex., for U.S.

Dick DeGuerin, Houston, Tex., for Sidney Mourning.

Frank Ivy, Austin, Tex., for Willoughby Tullos.

Gerry Goldstein, Goldstein, Goldstein & Hiley, San Antonio, Tex., for Allen Themer.

Joseph A. Turner, Terrence W. Kirk, Austin, Tex., for Charles Terzian.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

## I. INTRODUCTION

Before the Court are all of the Defendants' Motions to Suppress. A hearing

was held on these motions on May 11 through May 12, 1989, and May 17, 1989. The Defendants are charged in a fourteen count Second Superseding Indictment, filed in this Court on January 3, 1989. During the hearing on May 11, 1989, the Court granted Mourning's Motion to Sever, and Mourning entered a plea of guilty pursuant to a plea agreement on June 19, 1989.[1] The indictment charges the Defendants with various drug offenses under Title 21 of the United States Code. The indictment is the result of a "reverse sting" operation coordinated by the Drug Enforcement Administration ("DEA").

## II. FINDINGS OF FACT

1. The investigation that led to the arrest of these four Defendants arose out of information provided by a confidential informant.[2] Through information provided by the informant, in August, 1988 the DEA commenced a reverse sting operation involving the sale of approximately 600 pounds of marijuana. The informant was provided with a tape recording device and told to tape all conversations he had with any of these Defendants. DEA Special Agent Gray Hildreth coordinated this investigation. The informant told Agent Hildreth that he was familiar with one of the Defendants as a person who could potentially purchase marijuana. The informant took Agent Hildreth by a studio or warehouse on Old Koenig Lane in late July or August 1988. This warehouse was identified as a music studio frequented by Tullos and others. The informant identified the warehouse as Tullos' warehouse and stated that he had participated in drug deals with Tullos there in the past.

2. Based upon conversations between Tullos and the informant, a meeting was scheduled between Agent Hildreth (acting in an undercover capacity), Tullos, and a potential purchaser of marijuana, later identified as Mourning. In this transaction the informant was acting as the ultimate seller of the marijuana and Agent Hildreth

was acting as his "leg-man." The meeting was scheduled for September 10, 1988, and was to take place at the studio. Agent Hildreth arrived at the studio at approximately 4:30 p.m. where he met Tullos. They talked and toured the studio for approximately 10 minutes before Mourning arrived. During this discussion Tullos talked about previous drug deals in which he had participated, and stated that he had been involved in deals with the informant in the past and had made good money. Mourning then arrived and was identified as the buyer. He asked for a sample of the marijuana and Agent Hildreth went to his car and brought in a 16 pound sample. Mourning inspected it, asked about the packaging, the quantity, and the quality of the marijuana, and offered to buy all that Agent Hildreth had to sell. Mourning insisted on keeping the sample, but Agent Hildreth would not allow him to do so. He took back the sample and after an argument ensued, left the studio. Despite the argument, Tullos stated that he would attempt to contact the informant to arrange another meeting that evening to work out the final details of the transaction. In fact, both Hildreth and Tullos attempted to call the informant before Hildreth left the studio that afternoon.

3. A meeting did in fact occur on the evening of September 10, 1988 between Tullos and the informant. That meeting occurred in a bar on Sixth Street in Austin, Texas. Mourning also appeared at the meeting, although he was not expected to attend. Mr. Mourning introduced himself to the informant and started talking about the transaction, stating that he was happy to have a new source. Arrangements were made that evening for Agent Hildreth to meet Defendants Tullos and Mourning on the afternoon of September 11, 1988 at the studio.

4. On September 11, 1988 Agents of the Federal Bureau of Investigation, DEA, and Texas Department of Public Safety set up

---

1. The Court has taken under advisement the remaining Defendants' Motions to Sever.

2. Because his identity is well-known to all of the Defendants in this matter, this informant was referred to at the hearing as the "not-so-confidential informant."

to conduct surveillance on the warehouse. When Agent Hildreth arrived at the warehouse on that afternoon, already there were Defendants Tullos, Mourning, and Themer. Agent Hildreth had not met Themer and in fact did not expect him to be there. Agent Hildreth's understanding of the manner in which the deal would occur was that Agent Hildreth would be provided a vehicle in which to load the 600 hundred pounds of marijuana. He was to take the vehicle to his "stash house," load it full of the marijuana, return it to the studio, and receive the payment for the marijuana. This is not in fact the manner in which the deal occurred, however. Upon his arrival at the warehouse on the afternoon of September 11, 1988, a brief meeting between Defendants Tullos, Mourning, Themer, and Agent Hildreth occurred. Mourning took the lead at the meeting, and gave orders to the participants. He told Agent Hildreth that he was to drive his own vehicle to his "stash house", with Themer following in his pickup truck. Hildreth was then to assist Themer in loading the marijuana into Themer's pickup truck, and direct Themer back to the studio. He was to then later contact Tullos to receive his payment. Mourning stated that he had $65,000 in a safe at his house, which would act as a partial payment for the marijuana. Mourning directed Tullos to drive to Mourning's house and retrieve the money. Tullos gave Agent Hildreth Tullos' home phone number on a slip of paper so that Agent Hildreth could call Tullos after the marijuana was loaded into the truck. Themer stated to Agent Hildreth that all Hildreth needed to do was to take Themer to the stash house and help him load the truck, and Themer would find his way back from there. Although Agent Hildreth had a "stash house" that he potentially could have used for this transaction, the house was not in a condition to be used on this date. He had intended to drive to the Texas Department of Public Safety's offices and load the marijuana in the truck, return the truck to the warehouse, receive his payment, and then arrest all of the Defendants.

5. The Defendants departed the warehouse at approximately the same time.

Themer was following Agent Hildreth, thinking Agent Hildreth was going to his "stash house." Agent Hildreth, however, drove approximately two miles to a 7-Eleven. After exiting his car, he informed Themer that he needed to go into the store to purchase a few things. Themer was then placed under arrest by other officers who had been following Themer and Agent Hildreth. Agent Hildreth then ordered the arrest of Defendants Tullos and Mourning.

6. Defendants Mourning and Tullos had been followed to Threadgill's restaurant on North Lamar in Austin, Texas. Upon orders from Agent Hildreth, the two were arrested. Tullos was arrested immediately outside of the restaurant, and Mourning was arrested inside the restaurant.

7. The vehicles that these three Defendants were driving immediately prior to their arrests were all impounded for administrative forfeiture. A cursory search of the vehicles was conducted by officers immediately at the time of arrest, and later a more thorough inventory search was conducted pursuant to DEA policies. In Themer's truck, the officers found a .38 caliber pistol loaded with teflon-coated bullets. They also found a small vial of cocaine, and rubber gloves with cocaine residue. In Mourning's car, the officers found a Sports Illustrated magazine with an address label under the name of Chris Ely at 1106 Falcon Ledge. Tullos' truck was also searched and officers seized a mobile phone that apparently had been used during some of these transactions.

8. Tullos was taken back to the studio, which had been secured by officers after the Defendants had been arrested. Tullos was asked for consent to search the warehouse, and that consent was given, and a written consent form was signed by Tullos. Tullos was read his rights at the time he was arrested, and Agent Hildreth again asked Tullos if he had been given his rights before Tullos signed the consent form. At the time that he arrived at the warehouse, Tullos was handcuffed, but the handcuffs were removed immediately by Agent Hildreth. Agent Hildreth testified that Tullos was calm during these discussions, and no

weapons were drawn at this time. The tone of the voices was very normal. Agent Hildreth further testified that Tullos seemed intelligent during all of the discussions he had with him, and that he appeared to have no trouble understanding the discussions concerning the search of the warehouse. Agent Hildreth further testified that he informed Tullos that he had a right not to consent to the search, but he also told Tullos that he could get a warrant to search if Tullos did not consent.

9. The warehouse was opened with a key from Tullos' key ring, and a search of the entire warehouse was conducted. In the warehouse, hidden within a box, the Agents found a small locked safe or strong box. Tullos denied that the lock box was his, and stated that he did not know whose lock box it was. At no time did Tullos inform the officers that they were not permitted to search the contents of the lock box, and no limitation was ever placed on the search of the warehouse. The lock box was returned to DPS headquarters, where the lock was picked. Inside the box, the Agents found approximately one kilogram of cocaine.

10. After his arrest, Themer was taken to DPS headquarters and questioned. As with the other Defendants, Themer was read his rights at the time of the arrest. At some point during the questioning, Themer was told that Mourning was in another room in the headquarters, and that the officers wanted to know where Mourning lived. Themer stated that he did not know the address, but he could probably pinpoint the house on a map. The Agents then brought a map to Themer, but he was unable to specifically point to the location of the house on the map. He did state, however, that he could take the Agents directly to the house in a car. Special Agent Jack Derrington of the DEA took Themer in his car, and Themer led Officer Derrington to an address on Falcon Ledge. Derrington was followed by two other DEA agents. Themer identified a house at 1106 Falcon Ledge as Sidney Mourning's. Agent Derrington did not know that a Sports Illustrated magazine had been found in Mourning's car with this same address on the address label. Agent Derrington testified that Themer had no doubt in identifying the house, or in directing him to the house.

11. The house was secured by the DEA agents, and a search warrant was procured for the search of the house. Among the information in the affidavit for the search warrant were the statements made by Themer that he had been to Mourning's house, that he knew where the house was, that he agreed to take the Agents to the house, and that he knew the house at 1106 Falcon Ledge to be Mourning's primary residence. A warrant for the search of the house was issued, and a search of the house was conducted. Among the items found in the search of the house, were the following: approximately one-half pound of cocaine, a bag of white tablets, drug paraphernalia, a safe with $55,000 in cash, scales for measuring large quantities, a more precise digital scale for measuring smaller quantities, and large boxes with marijuana residue.

12. Subsequent to the day of arrest, Agents determined that the person holding the lease for the warehouse in which the kilogram of cocaine was found was Defendant Charles Terzian. During discussions in October 1988 with Terzian, Terzian told Agent Hildreth (after having been informed of his rights) that he was the lessee of the warehouse, but that he did not go there, and had a falling out with the people who did frequent the warehouse. Terzian also told Agent Hildreth that many people went there and had access to that warehouse. Agent Hildreth asked Terzian to provide a sample of his fingerprints, but Terzian initially refused. Eventually, a grand jury subpoena was issued for those fingerprints, and Terzian provided Hildreth with fingerprint samples. These fingerprints matched prints found on the plastic wrappers of the cocaine found in the safe.

13. Terzian testified at the hearing on the Motions to Suppress, and stated that he was the lessee of the warehouse, and that he paid the rent on the warehouse. He stated further that the safe was his safe, and that he had authorized no one to have

access to that safe. He did admit, however, that five to ten people had access to the warehouse and numerous people had keys to the warehouse.

## III. CONCLUSIONS OF LAW

### A. *Mourning's Motion* [3]

Mourning is charged in Count One with conspiracy to possess with the intent to distribute more than one hundred kilograms of marijuana. In Counts Two through Four, Mourning is charged with possession with intent to distribute hashish, marijuana, and cocaine, respectively. In the instant motion, Mourning complains about the warrantless search of his vehicle at the time of his arrest, and the search of his home pursuant to a warrant on the evening of his arrest. He seeks to suppress all of the items seized during both of those searches.

Mourning argues that there was no probable cause to search his automobile, and that he was in custody, nowhere near the vehicle at the time of its search, and therefore no exigent circumstances warranted the search of the car. Mourning also objects to the search of his house pursuant to a warrant, claiming that the affidavit in support of the search warrant contained false material statements, as well as insufficient probable cause to support the issuance of the warrant. Finally, Mourning objects to the warrant for the search of his home on the basis that the warrant permitted a general search, and was therefore unreasonable.

### 1. The vehicle search

■■■ There can be no question that the Agents had probable cause to arrest Mourning. He had just negotiated a transaction in which he would purchase 600 pounds of marijuana. He had agreed to pay a specific price for the marijuana, had made arrangements for the payment to be made, as well as for the marijuana to be delivered. He had sent a person under his apparent employ to pick up the marijuana. Further, the Agents had probable cause to

believe that Mr. Mourning's car was used to facilitate the sale of a controlled substance. Thus, its seizure was proper pursuant to 21 U.S.C. § 881(a)(4). *See United States v. Judge*, 864 F.2d 1144, 1145 (5th Cir.1989).

■ The remaining question as to Mourning's vehicle is therefore whether the Agents properly inventoried Mourning's car. Government counsel provided the Court with those portions of the DEA manual that pertain to inventory searches of property in the possession of an arrestee at the time of his arrest. Excised portions of these manuals were provided to defense counsel at the hearing. As stated by the court in *United States v. Judge*, the question this Court must determine is "whether the agents' actions, when viewed from an objective standpoint, can reasonably be said to have an administrative or safety motivation, as opposed to an evidentiary one." *Id.* at 1146. Further, it is sufficient if the DEA agents had *both* an evidentiary, *and* an administrative motive, so long as one of the motives is administrative. *Id.* at 1147 n. 5.

■■■ The Court finds, pursuant to *United States v. Judge*, that the seizure of the vehicle was proper pursuant to the dictates of 21 U.S.C. § 881(a)(4). Further, the search of the vehicle was a proper inventory search pursuant to DEA procedures. The fact that the car was safely locked in the parking lot of Threadgill's restaurant does not impact the conclusion in this case, because once the Agents decided they had probable cause to seize the car as a forfeitable asset, there was no need for the Agents to decide whether leaving the car unattended in the parking lot would impose upon them a risk of a later claim by the Defendant if the car was damaged in any way. They had the right at that point to impound the car. Accordingly, insofar as Mourning's Motion to Suppress seeks the suppression of items found in his car at the time of his arrest, the Court will Deny the motion.

---

**3.** The Court entered an order on February 15, 1989 on Defendant's Motion for Review and Revocation of Detention Order, which sets out a fair amount of background related to Mourning.

### 2. The search of the residence

█ Mourning claims that the statements attributed to Themer in the affidavit in support of the search warrant for his residence were false material statements. Specifically, in an affidavit attached to Mourning's Motion to Suppress, Themer stated that he did not agree to show the Agents the location of Mourning's house, but rather was simply told to take a ride with an Agent. He allegedly told Agents that he did not know where Mourning lived, because he had only been there at night, and only recalled that the house was made of stone. He claims that he did not tell the Agents that he had been to the house on numerous occasions, but rather had stated that he had only been there once or twice to pick up band equipment. Finally, he denies that he gave the Agents directions to the house, or that he identified a particular house in any way.

At the hearing on this motion, at least two DEA Agents testified concerning the statements made by Themer regarding the location of Mourning's residence. These statements completely corroborate the statements in the search warrant affidavit, and contradict the statements, self-serving in nature, in Themer's affidavit. The Court finds the testimony of the DEA Agents concerning the statements made by Themer more believable than the statements in Themer's affidavit. Based upon this finding, the Court need not strike any of the statements in the warrant affidavit attributed to Themer. *See, Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Probable cause to issue a warrant exists when the Magistrate is provided with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched. *United States v. Morris,* 647 F.2d 568, 573 (5th Cir.1981). Great deference is given to the Magistrate's determination that probable cause was shown. *United States v. Marbury,* 732 F.2d 390, 395 (5th Cir.1984). The review of a warrant is to be conducted in a common sense and realistic manner.

*Doescher v. Estelle,* 666 F.2d 285, 289 (5th Cir.1982).

█ Reviewing the warrant and affidavit in this case under these standards, the Court concludes that the warrant was issued with probable cause. The Magistrate was aware that Mourning had negotiated the purchase of a large quantity of marijuana, and had information sufficient to give him reason to believe that Mr. Mourning was a drug dealer. Further, the Magistrate had reliable information as to the exact location of Mourning's residence. He had reason to believe that there was a large quantity of cash at the residence, based upon statements of Agent Hildreth and the conspirators in this case. Further, a common sense review of the warrant and affidavit indicates that the Magistrate had probable cause to believe that evidence of drug trafficking would be found at Mourning's residence. Accordingly, the Court concludes that there was probable cause for the issuance of the search warrant in this case.

█ Finally, the Court rejects the Defendant's argument that the warrant in this case authorized a general search. The Court finds that the warrant described with sufficient particularity the items to be seized and the things for which the Agents were authorized to search. *Cf. Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The Court therefore rejects all of the arguments in support of Mourning's Motion to Suppress and denies the motion.

### B. *Tullos' Motion*

Tullos is charged in the indictment in Counts One, Eight, and Nine through Fourteen. In Count One, he is charged with conspiracy to possess with the intent to distribute more than 100 kilos of marijuana. In Count Eight he is charged with possession with intent to distribute more than 500 grams of cocaine, and in Counts Nine through Fourteen, he is charged with the use of a telephone device to facilitate a felony. Tullos complains of three searches: (1) the search of his vehicle at the time of his arrest; (2) the search of the warehouse

which resulted in the discovery of approximately one pound of cocaine in a small lock box; and (3) the tape recording of telephone conversations between the informant and Tullos.

### 1. The search of the vehicle

 As discussed above, the Agents had probable cause to arrest Tullos and to seize Tullos' vehicle as an asset that was forfeitable under Title 21 of the United States Code. The inventory of the contents of the vehicle was conducted pursuant to standard DEA procedures set forth in the DEA manual which was reviewed by the Court *in camera* prior to the decision on this motion. Therefore, the search of the vehicle was proper. *See Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987); *United States v. Judge,* 864 F.2d at 1145–47.

### 2. The search of the warehouse

As noted in the Findings of Fact, Tullos gave the officers his consent for the search of the warehouse. That consent is evidenced in a written consent form, which was introduced at the hearing on this motion. Tullos' only argument in support of his Motion to Suppress the fruits of the search of the warehouse is that the consent given by him after his arrest was not voluntary. There is, however, no evidence to support this argument.

The testimony of the officers at the hearing on this motion was uncontroverted concerning the Defendant's demeanor at the time of his consent. There were no raised voices, no drawn weapons, and the Defendant was not handcuffed. All the officers who testified on this issue stated that the Defendant appeared to be calm at the time that consent was given. Tullos had been warned of his constitutional rights against self-incrimination at the time that he was arrested. He was again asked whether his rights had been read to him prior to signing the consent form. At no time did Tullos indicate that he did not have the authority to consent to the search of the warehouse, and indeed, he had exercised control over the warehouse at all times relevant to

this case. Further, he possessed a key to the warehouse, and had met there with Agent Hildreth on two occasions, referring to the warehouse as "my" warehouse on at least one occasion.

 Whether a defendant's consent to search a premises is voluntarily given is a question of fact for the Court to determine based upon the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1979, 64 L.Ed.2d 497 (1980); *Schneckloth v. Busta-monte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). The Government must establish by clear and convincing evidence that the consent was freely and voluntarily given. *United States v. Gonzalez,* 842 F.2d 748, 754 (5th Cir.1988). In deciding whether the consent was freely and voluntarily given, the Court should take into account the following factors:

(1) The defendant's custody status;

(2) the use of coercive procedures;

(3) the nature of cooperation with the police;

(4) the defendant's awareness of the right to refuse to consent;

(5) the defendant's education and intelligence; and

(6) the defendant's belief that no incriminating evidence would be found.

*United States v. Galberth,* 846 F.2d 983, 987 (5th Cir.1988). The fact that consent is obtained after an individual is arrested and is in custody is not necessarily an indication that the consent was not voluntary. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

 Viewing the totality of the circumstances, as well as the factors set forth above, it is clear in this case that the consent given by Tullos was voluntary. As stated, no guns were drawn and the atmosphere was one of calmness. There is no indication that any coercive measures were used by the police to obtain Tullos' consent. The Defendant had been given his rights, and it appears that the Defendant was educated and intelligent. Further, the Defen-

dant stated that no incriminating evidence would be found in the warehouse.

■ In addition, there is no doubt that Tullos had the right to consent to the search of the warehouse. He had full access to the warehouse, and had a key to the warehouse. No evidence was admitted to the contrary. Accordingly, the Court finds that Tullos' consent to search the warehouse was freely and voluntarily given, and therefore that the search of the warehouse was proper.

3. The tape recorded conversations

There is absolutely no evidence to indicate that the recorded telephone conversations between Tullos and the Government informant were anything but properly made, consensual tape recordings. The Defendant offered no evidence that contradicts the Government's showing in this regard, and therefore the Court will deny the Motion to Suppress on these grounds.

C. Themer's Motion

Themer is charged in Counts One, Six and Seven of the Second Superseding Indictment. In Count One, he is charged with conspiracy to possess with intent to distribute more than 100 kilos of marijuana. In Count Six, he is charged with the use of a firearm in a narcotics offense, and in Count Seven, he is charged with possession of cocaine. Themer only complains of the search of his vehicle immediately after his arrest, and two days after his arrest. That search resulted in the discovery of the hand gun made the basis of Count Six, and the cocaine made the basis of Count Seven.

■ The Court has found above that there was definitely probable cause to arrest these Defendants. Specific to Themer, Agent Hildreth had just witnessed the final negotiation of a 600 pound marijuana transaction. As part of the plan to effectuate the transfer of the marijuana, Themer agreed to follow Hildreth to his "stash house" in order to pick up the marijuana. There is no doubt that Agent Hildreth had probable cause to believe Themer had engaged in a conspiracy to possess with intent to distribute marijuana.

■ There are at least two bases for finding the search of Themer's vehicle proper. First, the search was proper incident to Themer's arrest. See, New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); United States v. Basey, 816 F.2d 980 (5th Cir.1987). In Belton the Court stated: "When a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Belton, 453 U.S. at 460, 101 S.Ct. at 2864 (footnote omitted). Further, the Court in Belton held that the contents of any container found within the passenger compartment of a vehicle could also be examined. Id. In Basey, the Fifth Circuit stated that "Belton makes it plain that ... a search [incident to arrest] will be upheld even if it occurs after an occupant placed under arrest is out of the vehicle...." Basey, 816 F.2d at 991.

The facts of this case fit squarely within the Belton rule. Themer was arrested while he was in his vehicle, and the search of his vehicle was conducted immediately after his arrest. That search disclosed a .38 caliber revolver loaded with teflon-coated bullets. There is no question that this was a search incident to his arrest, and therefore the fruits of that search are admissible under Belton.

■ A later, more thorough search, turned up the vial of cocaine made the basis of Count Seven. The Government argues that the discovery of this evidence was the result of a proper inventory search of the vehicle. The Defendant responds by arguing that because there are no regulations detailing specific standardized procedures, and there is no standardized inventory form, the "inventory" search of Themer's vehicle is not within the Colorado v. Bertine case cited above. The Defendant also argues that because no list was ever made of the contents of the vehicle, that this was not truly an inventory search.

As with the other Defendants, the Agents had probable cause to seize Themer's vehicle as a forfeitable asset under

Title 21. Further, the vehicle was properly impounded after it was seized incident to Themer's arrest. The question remaining, therefore, is whether the search conducted two days after the impoundment of the vehicle was a proper inventory search under *Colorado v. Burtine.* Although the procedures followed in this case are not exemplary, the Court finds that the search of Themer's vehicle was a proper inventory search.

 The Defendant's argument that there are no regulations to govern the DEA's search of his vehicle is not supported by the evidence. The Court reviewed *in camera* the regulations on this point in the DEA manual. The regulations are specific and well defined. The Court permitted a limited view of the manual by defense counsel, but reviewed the entire relevant portion in chambers. As noted in *United States v. Judge,* the DEA manual is not subject to public disclosure, and permitting defense counsel only a limited view of the manual is a proper procedure. *Judge,* 864 F.2d at 1147. The evidence does not support the Defendant's claim that there are no standardized forms for the DEA to use in its inventory searches, or that no list was made here. The form used by the DEA requires the listing of only items of evidentiary value. Again, the Fifth Circuit has stated that such a procedure does not impugn the inventory process. *Judge,* 864 F.2d at 1145 n. 1.

The search of Themer's vehicle occurred as the DEA took possession of the car from the impound yard at DPS. Although the procedures followed were not ideal, the search was conducted pursuant to the DEA manual's regulations, and the search was a proper search under *Burtine* and *Judge.* Accordingly, the Court finds that the discovery of the Defendant's firearm and the vial of cocaine were the result of searches permitted incident to his arrest, and pursuant to DEA inventory procedures. Accordingly, the Court will Deny Themer's Motion to Suppress.

### D. *Terzian's Motion*

Terzian is charged solely in Count Eight of the Second Superseding Indictment, which alleges that he possessed with intent to distribute more than 500 grams of cocaine. Like Tullos, Terzian attempts to suppress the cocaine made the basis of this charge. As described above, Tullos consented to the search of the warehouse, and that search resulted in discovery of a lock box. The lock box was then opened and the cocaine at issue in Count Eight was discovered. Terzian's fingerprints were found on the cocaine.

Terzian alleges that Tullos' consent was not voluntarily and freely given. He next argues that even if the consent was voluntarily given, Tullos did not have the authority to consent to a search of the lock box. The Government argues that Terzian abandoned the lock box, and therefore does not have standing to challenge its discovery. It further argues that if Tullos lacked the authority to consent to the search of the lock box, the cocaine should nevertheless be admitted under the inevitable discovery rule. In the alternative, the Government argues that the cocaine is admissible under the good faith exception to the exclusionary rule.

### 1. Abandonment

The basis for the Government's claim that Terzian abandoned the cocaine is a conversation between Terzian and Agent Hildreth that occurred approximately one month after the seizure of the cocaine. The Agents had discovered that Terzian was the lessee of the warehouse, and went to visit him at his place of employment. At that time, Agent Hildreth warned the Defendant of his constitutional rights, and the Defendant agreed to waive those rights. The Defendant stated that he no longer went around the warehouse, and that he had had a "falling out" with the people who did frequent the warehouse. The Government contends that these statements evidence Terzian's intent to abandon the property he kept at the warehouse, including the lock box that contained the cocaine.

 The parties argue whether the statements made by Terzian indicate that

he had stopped going to the warehouse *prior* to the discovery of the cocaine, or *after* the time that the cocaine was discovered. The Court need not resolve this argument, however, because regardless of the Court's view of Terzian's statements, there is not sufficient evidence to indicate an abandonment of the warehouse or its contents. The testimony at the hearing indicated that Terzian was the lessee of the warehouse at the time it was searched, and had paid the rent for the warehouse just days before the search. Further, the Government's own testimony indicates that Terzian's car was seen at the warehouse shortly after the warehouse was searched. Certain vague statements that the Defendant did not go around the warehouse anymore, whether before or after the search, are insufficient to show an abandonment of the Defendant's interest in that property, particularly when the Defendant is the lessee and the rent-payer for that property. As the Supreme Court has stated, it is not reasonable to "equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest in the [property]." *Walter v. United States*, 447 U.S. 649, 658 n. 11, 100 S.Ct. 2395, 2402 n.11, 65 L.Ed.2d 410 (1980). Further, Terzian never relinquished possession of the safe, or disclaimed ownership of the safe regardless of how his statements to Hildreth in October are construed. *See United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir.1987). Accordingly, the Court finds that Terzian did not abandon this property, and therefore has standing to contest the search and seizure of the safe.

### 2. Consent issues

As set out above, the search of the warehouse was conducted without a warrant, and pursuant to the written consent of Tullos. It is a longstanding rule that warrantless searches are *per se* unreasonable under the Fourth Amendment, unless the search falls within one of the exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). A consensual search is an exception to the warrant requirement, however. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In such a case, the Government has the burden of proving that the consent was effective. *Id.* at 548, 88 S.Ct. at 509. Consent may be given by a third party, *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), so long as the consent is freely and voluntarily given, *Bumper*, 391 U.S. at 548, 88 S.Ct. at 509, and the third party has the authority to give it. *Frazier*, 394 U.S. at 740, 89 S.Ct. at 1425.

#### (a) *Voluntariness of the consent*

As set forth above, there is no question that Tullos' consent to search the warehouse was freely and voluntarily given. The consent occurred after Tullos had been advised of his constitutional rights, and been told that he did not have to agree to the consent. It occurred at a time when Tullos was not in handcuffs, and no guns were drawn. No coercive tactics were used to obtain the consent.

#### (b) *Authority to give consent*

Terzian concedes, and the Court has already found with respect to Tullos' motion, that Tullos had the authority to consent to a search of the *warehouse*. The point of contention on Terzian's motion is whether Tullos had the authority to consent to a search of the *lock box*, or whether, even if he did have such authority, he ever gave his consent to search the box. The Government argues that the consent form signed by Tullos contains no reservations, and permits a general search of the warehouse, including its contents. Further, they argue that when the lock box was found and presented to Tullos, he did not tell the agents they could not search it.

 These arguments are not persuasive, however. Third party consent validates a search only when a defendant can be said to have assumed the risk that someone having authority over the area to be searched would permit the governmental intrusion in his own right. *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974). In the context of a locked container such as that

presented in this case, it cannot be said that the owner has "assumed the risk" that one without access to the container will consent to its search. *United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978). *See United States v. Rizk*, 842 F.2d 111, 112–13 (5th Cir.1988). When faced with closed, locked containers found in areas to which several people have access, the Government must show that the person giving consent has authority to consent to the search of the container. This the Government has failed to do. Indeed, when presented with the lock box, Tullos disclaimed any knowledge of the box, and said he did not know whose it was. The Government argues from this that because Tullos did not tell the agents they could not open the box, he was giving his consent for them to search it. Even if this rather dubious argument is accepted, nothing in Tullos' statement can reasonably be construed as evidence that Tullos had the *authority* to give such consent.

The Fourth Circuit has articulated three principles that limit the extent to which third party consent will excuse the absence of a warrant, and the principles are well-stated in Judge Phillips' opinion in *Block*:

> [T]hird person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source, *Stoner v. California*, 376 U.S. [483] at 489, 84 S.Ct. 889 [11 L.Ed.2d 856 (1964)]; nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person, *Reeves v. Warden*, 346 F.2d 915 (4th Cir.1965); *United States ex rel. Cabey v. Mazurkiewicz*, 431 F.2d 839 (3d Cir.1970); nor, still more certainly, when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access, *United States v. Wilson*, 536 F.2d 883 (9th Cir.1976).

*Block*, 590 F.2d at 540. This case falls precisely within the last category articulated by Judge Phillips. Here, the very nature of the lock box made manifest the owner's expectation of privacy. *See id.* at 541. Tullos clearly disclaimed any right of access to the box when he stated that he did not know whose box it was, and had no key to it. Thus, the Agents could not rely on Tullos' consent to search the warehouse in order to search the lock box.

■ The Government attempts to avoid the effect of Tullos' disclaimer by arguing that drug dealers commonly deny knowledge of inculpatory items when presented to them, and the agents were entitled to disbelieve Tullos' claim of ignorance. The case the Government cites, however, is not a consent case, and does not stand for the proposition cited. *See McKennon*, 814 F.2d 1539. The Court has found no case that permits the government to construe a statement that clearly withdraws consent to *validate* a search. Indeed, in a Fifth Circuit case with facts very similar to those presented in this case, the court excluded the seized evidence on Fourth Amendment grounds. *Holzhey v. United States*, 223 F.2d 823 (5th Cir.1955). In *Holzhey*, the government, with the consent of one of the occupants, searched a living space to which several people had access. Upon discovering a locked cabinet, the person who gave consent stated that she had never seen the cabinets and had no idea who owned them, but that they might be the defendant's. *Id.* at 825. Nevertheless, the government forced the cabinets open. At trial, the government argued, as here, that they had consent to search the container, and the court rejected that argument. *Id.* at 826–27. The facts of *Holzhey* are indistinguishable from this case, and the result must be the same.

■ Finally, the Government argues on the issue of consent that Terzian's expectation of privacy in the lock box, given that it was stored in a warehouse/studio to which numerous people had access, is not an expectation "that society is prepared to recognize as reasonable," citing *Hudson v. Palmer*, 468 U.S. 517, 525 n. 7, 104 S.Ct.

3194, 3199 n. 7, 82 L.Ed.2d 393 (1984). Judge Phillips responded to this argument eloquently in *Block:*

> Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's "enclosed spaces"—mankind's valises, suitcases, footlockers, *strong boxes*, etc. —are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense *when such effects are deposited temporarily or kept semi-permanently in public places or in places under the general control of another.*

*Block*, 590 F.2d at 541 (emphasis added). It is perfectly reasonable to recognize an expectation of privacy in a hidden, locked safe or strong box, despite the fact that more than one person, and as many as ten, had keys or access to the studio.

■ In summary, the Court finds that the Government violated Terzian's Fourth Amendment rights when it searched his locked strong box without a warrant, and without his consent. Accordingly, absent the application of the good faith exception, or the inevitable discovery rule, the evidence seized pursuant to that search must be suppressed. A discussion of these two doctrines follows.[4]

### 3. Inevitable discovery

■ In an effort to cure the error in searching the strong box, the Government argues that the cocaine is nevertheless admissible under the inevitable discovery exception to the warrant requirement. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The Fifth Circuit, in applying the inevitable discovery exception, requires the Government to show by a preponderance of the evidence:

(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct;

(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and

(3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation.

*United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir.1985) (citations omitted). In discussing the application of this three-part test, the Eleventh Circuit stated that the Government cannot use the inevitable discovery rule to cure a warrantless search by arguing that the agents had probable cause, and could have, and eventually would have, obtained a warrant. *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir.1984). The rationale for this rule is simple and compelling:

> Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant be obtained before the search takes place. Our constitutionally-mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer would be greatly undermined.

*Id.* (emphasis in original, citation omitted).

The Government makes precisely the argument rejected in *Satterfield*. It states that the officers had probable cause to obtain a warrant for the search of the box, and even contemplated getting a warrant for the entire warehouse prior to Tullos' consent. Thus, it argues, it could have applied for and obtained a warrant, and eventually discovered the cocaine in a constitutionally permissible fashion. As the *Satterfield* court stated, such an argument would essentially emasculate the warrant requirement, and this Court therefore rejects that argument.

---

**4.** As might be obvious, because the Court has found that Tullos lacked the authority to consent to the search of the box, it follows that he also lacks standing to complain of the search of the box. The Court has found that the search of the studio was proper, and therefore Tullos has no basis for challenging the search of the box, and the evidence is admissible in the Government's case against him.

Even if the Court did not follow the *Satterfield* rule, the Government has failed to show by a preponderance of the evidence that it had *any* leads *at the time of the misconduct* that would have led it to obtaining probable cause to search the lock box. All it knew when the Agents opened the lock box was that the box had been found in the studio, and that Tullos denied that it was his. The only information they had about Terzian was that their informant had identified someone known only as "Chuck" as being a distributor of narcotics. They had no information linking him to the studio at the time the misconduct occurred. Further, there was no showing that the Agents were actively pursuing an independent line of investigation at the time the box was opened. Thus, the Government failed to carry its burden on the second and third elements set forth above.

Accordingly, the inevitable discovery rule will not cure the errors of the agents in opening the strong box without a warrant.

### 4. The good faith exception

Finally, the Government argues that application of the good faith exception to this case will save the admissibility of the cocaine. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Defendant responds with two arguments. First, he states that it is not at all clear that the good faith exception even applies to a warrantless search such as that here, and second, even if it does, the Government has failed to show that it in reasonable good faith relied on Tullos' consent in opening the strong box.

 As the Government notes, the Fifth Circuit, prior to *Leon*, applied the good faith exception to a warrantless arrest case. *United States v. Williams*, 622 F.2d 830, 840 n. 1 (5th Cir.1980) (en banc). The Government argues that this demonstrates the applicability of the doctrine to a warrantless search case such as this. In *Williams*, the circuit stated:

Henceforth in this circuit, when evidence is sought to be excluded because of police conduct leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question, if mistaken or unauthorized, was yet taken in a reasonable, good-faith belief that it was proper. If the Court so finds, it shall not apply the exclusionary rule.

*Williams*, 622 F.2d at 846–47. Although the Fifth Circuit has never explicitly stated that the *Leon* good faith rule applies to consent searches (which by their very nature are warrantless), the statement in *Williams* contains no limitation, and no such limitation has been put on the rule subsequent to *Leon*. The Court therefore finds that the Government is entitled to apply the good faith exception to this warrantless search case.

 The remaining question is whether the Government has established a reasonable, good faith belief that its conduct in opening the box was proper. The facts to which the Government points on this issue are essentially the same as those submitted in support of its inevitable discovery argument. Those facts are that the Agents believed they had probable cause to search the strong box, but they felt that obtaining a warrant was unnecessary because of the consent of Tullos, which the Agents reasonably believed extended to the strong box. Indeed, the Government argues, the Agents' good faith is established by the fact that they obtained a warrant to search Mourning's house that very evening, thus showing the Agents' realization of the legal duties imposed upon them by the Fourth Amendment.

The Defendant responds by pointing out that once Tullos disclaimed ownership and knowledge of the strong box, the Agents were put on notice that Tullos may not have had the authority to consent to its search. Going forward with the search by relying on Tullos' general consent, the Defendant argues, was therefore not reasonable, even if it was an action taken in good faith. The Court finds itself in agreement with the Defendant on this point. Actions taken in good faith, but not grounded in objective reasonableness, fall outside of the scope of the good faith exception. *Williams*, 622 F.2d at 841 n. 4a. It is

difficult for the Court to see how the Agents could have reasonably believed Tullos had given them consent to search the box when he disclaimed any knowledge about the box. In fact, under these circumstances there are only two things the Agents truly could have *reasonably* believed: (1) Tullos was telling the truth and the Agents knew or should have known they needed a warrant; or (2) Tullos *might* be lying, therefore creating a doubt in their mind about the need for a warrant.

In either circumstance, the policies underlying the exclusionary rule are furthered by excluding this evidence. Agents with doubts about the need for a warrant should not be encouraged to nevertheless go forward with a warrantless search, particularly when, as here, they are in exclusive possession of the item to be searched, and no exigent circumstances require immediate action. Although it does not appear that the actions here were taken in bad faith, and indeed the officers may have in good faith believed that they did not need a warrant, such a belief cannot in any fashion be described as grounded in objective reasonableness. The officers were operating in one of the few areas of Fourth Amendment law that is relatively clear, and their actions were taken in disregard of the warrant requirement of the Fourth Amendment. *Compare United States v. Mahoney,* 712 F.2d 956, 961–62 (5th Cir.1983) (finding good faith exception satisfied where officers were operating "along the cutting edges of two doctrines," and "only a sophisticated lawyer could have ... known with confidence that" he was acting without authority). Thus, the Court finds that the application of the good faith exception does not save this evidence from exclusion.

5. Summary

The Court concludes that Tullos' consent to the search of the studio did not, and could not extend to the lock box. The Agents were therefore required to obtain a warrant for the search, and their failure to do so renders the contents of the box inadmissible as to Terzian under the exclusionary rule. Neither the inevitable discovery rule nor the good faith exception save the search. The Court will therefore grant Terzian's Motion to Suppress.

IV. CONCLUSION

ACCORDINGLY, IT IS ORDERED that the Motions to Suppress filed by Mourning, Themer and Tullos are, in all things, DENIED. IT IS FURTHER ORDERED that the Motion to Suppress filed by Terzian is GRANTED, and the contents of the strong box found in the music studio at 118 Old Koenig Lane on September 11, 1988 may not be admitted into evidence in the case against Terzian.