UNITED STATES of America, Appellee,

v.

William E. BLOCK, Appellant.

No. 78–5086.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 15, 1978.

Decided Dec. 20, 1978.

Nelson M. Casstevens, Jr., Charlotte, N. C. (Robert P. Hanner, II, Charlotte, N. C., on brief), for appellant.

Harold J. Bender, Charlotte, N. C., Asst. U. S. Atty. (Harold M. Edwards, U. S. Atty., Asheville, N. C., on brief), for appellee.

Before WINTER, BUTZNER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

William E. Block appeals his conviction on both counts of a two-count indictment charging in one count conspiracy to procure, sell, and distribute heroin in violation of 21 U.S.C. § 846, and in the other, possession with intent to distribute and dispense heroin in violation of 21 U.S.C. § 841(a)(1). Following jury verdicts of guilty on both counts, the district court consolidated the counts for judgment and imposed a sentence of imprisonment for three years plus a mandatory three year term of special parole. A co-defendant, James Wade McGee, whose involvement with Block is important to consideration of Block's appeal, was convicted in their joint trial as a co-conspirator on the conspiracy count and as an aider and abettor on the possession count, but did not appeal his convictions.

On this appeal, Block assigns as error the admission into evidence of the fruits of what he contends was an unconstitutional search and seizure, and the denial by the district judge of his motion for judgment of acquittal. Concluding that the challenged evidence was unconstitutionally obtained, hence inadmissible, and that its admission cannot be declared by us to have been harmless beyond a reasonable doubt as to either count, we reverse and remand.

## I. FACTUAL BACKGROUND

For some time prior to October 24, 1975 —a critical date in this chronicle—law enforcement officers of the Charlotte, N. C. and Gastonia, N. C. police departments and of the North Carolina State Bureau of Investigation were engaged in a cooperative investigation of suspected organized drug traffic in the Charlotte-Gastonia area. In its course they acquired hard evidence that one James Wade McGee, a friend of the appellant, William E. Block, might be implicated in the traffic when McGee sold a quantity of heroin to an undercover agent. During this time, McGee was a frequent visitor, sometimes apparently for extended periods, in the Gastonia home of Block's mother, Mary E. Block, where Block, then twenty-three years old, occupied a room as his regular place of residence. Acting on information that McGee was then visiting the Block home, seven or eight of the investigating officers, armed with warrants for McGee's arrest, descended on the home at around 4:45 A.M. on the morning of October 24, 1975. Some covered the exits while others presented themselves to Mrs. Block, who came to an exterior door and admitted them into the house when informed that they were searching for McGee under warrants for his arrest. In the course of a general search of the house, some of the officers came to a room that Mrs. Block identified as that of her son William. The officers entered this room, still searching for McGee. Once in it, one of the officers saw, apparently in plain view, some paraphernalia associated with marijuana traffic:

plastic containers, triple beam scales, and some marijuana residue. At this point, their interest heightened, the officers' attention turned to a closed footlocker trunk of the army type that sat on the floor within two or three feet of the bed in William's room. Under circumstances hopelessly in dispute on the later conflicting testimony of the officers and Mrs. Block, the officers the proceeded to force open the trunk and seize from within it a quantity of material later identified as heroin. The officers' version was that prior to opening the trunk they obtained from Mrs. Block a voluntarily signed consent form that specifically authorized them to search her son's room and to remove from it any items that could be used as evidence. Such a consent form was in fact signed by Mrs. Block and given to them but, according to her, it was only presented to her after the trunk had been opened and searched and was at that time described to her as a receipt for the items seized.[1] The exact details of the opening of the trunk are also in dispute on the record, but certain critical aspects are clear and not disputed. The officers specifically asked Mrs. Block whose trunk it was, and were told that it was her son William's. The trunk was at that time fastened shut by some means that indicated to the officers that it was locked and that a key was required to open it. They asked Mrs. Block if she had a key and she replied that she did not. At this point one of the officers exerted sufficient force of some kind over a period of several seconds to cause the locking mechanism to come open.[2] Thereupon

---

1. The consent to search form, in its critical part, read: "I . . . authorize [named officers] to conduct a complete search of my premises located at 1013 Woodland Drive, Gastonia, North Carolina, (son's bedroom only). These officers are authorized by me to take from my premises any letters, papers, materials, or other property which may be used as evidence." As will appear in our opinion, the critical issue, assuming this form to have been voluntarily signed, was whether the authority claimed in it by the signer could in law extend to contents in the interior of the footlocker as an item of "other property" within the consent form's language.

2. The defense offered testimony that the footlocker was secured by a locked padlock, and

introduced in evidence a bent one that was so identified. The investigating officers would never concede that a padlock was the securing mechanism, but each who testified to the circumstances of the opening conceded that some securing device had to be forced by officer Dunn who actually opened it. Officer Ross testified that he "knew it required a key to get into the trunk" and that, "at first we couldn't get into it, but after we touched the lock and pulled on it, it opened." [Trial Transcript p. 38]. Officer Gerrett conceded that Dunn had difficulty in getting it open; that he had to "jiggle with it" to get it open; and that this "took him a couple of seconds." [Trial Transcript at 65].

the trunk was opened and the search and seizure of the heroin effected. It is undisputed that this trunk had been William's private property over a period of around ten years; that during this time it was kept in his room, locked while he was away; and that neither his mother nor anyone else had means of access to its interior nor permission to open it. So far as the circumstances attending William's occupancy of the room itself are concerned, there is again dispute on the record as to whether he occupied as a paying tenant or simply at the pleasure of his mother.[3] But it is undisputed that while the room was considered exclusively his in the familial arrangement, his mother had and exercised unquestioned rights of access to it for cleaning and other household purposes.

Following the footlocker search and seizure, the officers departed, their original search for McGee unsuccessful. It is apparently the case that when the search of October 24, 1975 was undertaken, Block's possible complicity with McGee or others in the drug traffic under investigation was not suspected. A few days after the search and seizure however, the searching officers brought Special Agent Landrum of the Drug Enforcement Administration of the United States Department of Justice into the investigation, making available to him the fruits of the search, including of course the information identifying Block as owner of the footlocker. From this point Landrum directed an investigation that resulted eventually in the federal indictments and convictions under consideration here. Just after the search in 1975, for quite cogent reasons, it was decided by the Government officers to delay seeking indictments against Block and McGee to see if others possibly involved with them might be implicated. Focus of the ensuing investigation under Landrum's direction was a so-called "El Paso Connection" that was believed to involve sources in El Paso regularly supplying narcotics to dealers who transported them into the Charlotte-Gastonia area for distribution. This investigation turned up two persons whose testimony eventually became critical in the cases against Block and his co-defendant McGee. One was Debra Davidson, a young college student from Gastonia, whom the investigating officers learned had been arrested on drug charges by Texas officers in El Paso on October 17, 1975. She informed the officers and later testified in Block's trial that she had traveled to El Paso on that occasion from Charlotte, N. C. specifically to pick up some marijuana for one Jerome Wilson; that Wade McGee had flown on the same flight; that while in El Paso she had on two occasions seen McGee in the company of her own drug supplier, a man named Steve Lochhead (named as a co-conspirator in Block's indictment); and that on one occasion when she purchased heroin from Lochhead, McGee, with her consent, injected heroin into her arm to test its quality. The other informant was a drug dealer named Hudman. Hudman informed the officers and later testified at Block's trial that he, Hudman, had been involved in the "El Paso Connection" at times prior to 1975 in partnership with the man Jerome Wilson named by Debra Davidson as her principal, and with one David Wells. Most critically he informed them, and later testified, that in October 1975, on a visit to Gastonia he, Hudman, met Block who told him that Block and McGee were buying heroin from Lochhead in El Paso through an arrangement set up by Hudman's sometime partner, David Wells, for which Block and McGee had paid a substantial sum.

With the case thus developed against Block he was indicted some two years after the research of October 24, 1975 and brought to trial. By pre-trial motion Block

3. A police officer testified that during the search Mrs. Block told him that William paid no rent, that he "doesn't have to." [Trial Transcript at 39]. Mrs. Block testified that she never made this statement, and that William did pay rent. The district court found as fact that Block was a mere guest, and we of course accept this as a proper finding on conflicting evidence.

sought to have suppressed the evidence obtained in the footlocker trunk search; the motion was denied after a pre-trial hearing; and he again objected to its introduction at trial. At the ensuing trial the Government's case against Block was based upon the testimony of Davidson and Hudman earlier summarized, that of two of the officers who participated in the footlocker trunk search and who described its conduct and its product in terms earlier summarized, and that of a crime laboratory chemist who identified the seized footlocker contents as heroin prior to its introduction in evidence.

## II. THE FOOTLOCKER SEARCH: AUTHORITY FOR THIRD PERSON CONSENT

■ When challenged by the pre-trial suppression motion, the Government undertook to justify the warrantless footlocker search, hence the admissibility of its evidentiary fruits, solely on the basis of consent by Block's mother to the search. On the question whether the consent was effective for this purpose the Government had the burden of proof by a preponderance of the evidence, *Bumper v. North Carolina,* 391

U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and in the judgment of the district court carried it, as the motion was denied and the evidence later admitted. In this we conclude the court erred.

■ Consent to search effective to validate a warrantless search and seizure may of course in appropriate circumstances be given by a person other than the victim of the search, *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States v. Peterson,* 524 F.2d 167 (4th Cir. 1975). To be effective it must be freely and voluntarily given, *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and the third person must have authority to give it, *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Reeves v. Warden,* 346 F.2d 915 (4th Cir. 1965). It is third person authority that is centrally in issue here.[4]

■ From whatever other sources this authority may be derived,[5] it is well settled that it may be based simply upon the fact that the third person shares with the absent target of the search a common authority over, general access to, or mutual use of the place or object sought to be inspected under circumstances that make it reasonable to

---

**4.** Block challenged the voluntariness of the consent as well as its authority. Although the circumstances of the search—its time in early morning, the number of officers involved, and the use of arrest warrants to gain initial entry—raised significant questions of voluntariness, these were considered by the district court which, with opportunity to weigh the conflicting evidence about the atmosphere of the search, specifically found as fact that the consent was voluntarily given. We need not review this finding in view of our conclusion that no matter how voluntarily given, the consent was without authority.

**5.** In theory, though rarely if ever in fact, third person authority could be derived from an actual agency relationship. While the Supreme Court has obliquely suggested this as one basis for third party consent, *Stoner v. California,* 376 U.S. at 488, 84 S.Ct. 889, and although the Seventh Circuit has struggled with a requirement that actual authority exist, *see United States v. Cook,* 530 F.2d 145 (7th Cir. 1976), the real linchpin of the developed doctrine is not agency power in the third person but simple authority in that person's own right to permit inspection. This right, either exclusive or

shared with the search victim, and acquiesced in by the latter, demonstrates that the absent search victim retains no reasonable expectation of privacy in the place or object. Consequently, when the third person "consents" to search, this does not thereupon vicariously waive an existing Fourth Amendment right in the search victim. It merely gives the police legal access and provides them the same non-trespassory vantage points that justify their plain-view searches and seizures. This authority could as well in theory derive from an actual agency, but it seldom will, and it should not routinely be sought in "strained applications of the law of agency." *Stoner v. California,* 376 U.S. at 488, 84 S.Ct. at 892; *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839, 845 (3d Cir. 1970) (Gibbons, J., dissenting). Even if this were the source of authority in a particular case, the operative fact that waived any Fourth Amendment rights would be the search victim's creation of the agency, and not the authorized agent's later "consent" to actual search. The expectation of privacy is gone with the creation of the right to permit access by whatever means.

believe that the third person has the right to permit the inspection in his own right and that the absent target has assumed the risk that the third person may grant this permission to others. *See United States v. Matlock,* 415 U.S. 164, 171 & n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Peterson,* 524 F.2d at 180, 181. *See also United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir. 1974) (per curiam).

■ On the other hand, it is equally well settled that third person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source, *Stoner v. California,* 376 U.S. at 489, 84 S.Ct. 889; nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person, *Reeves v. Warden,* 346 F.2d 915 (4th Cir. 1965); *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839 (3d Cir. 1970); nor, still more certainly, when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access, *United States v. Wilson,* 536 F.2d 883 (9th Cir. 1976).

Consonant with these principles, this Court has in recent years reached divergent results in two cases based on their critically distinguishing facts. In *United States v. Peterson,* 524 F.2d 167 (4th Cir. 1975), applying the first branch, we found that a mother had authority to consent to the search of a room in her own home that her son, target of the search, occupied as a member of the household in common with other children; while in *Reeves v. Warden,* 346 F.2d 915 (4th Cir. 1965), applying the second, we found that a member of a household who had general access to her son's room in a home in which they both lived as guests had no authority to consent to a search therein of a bureau drawer set aside exclusively for the son's use, although she exercised some measure of shared access with him to the bureau drawer as well.[6]

We conclude that here the district court misapprehended the correct application of these principles to the facts upon which it based the decision on the motion to suppress, and in consequence erred in concluding that effective consent had been given. Our review of the district court's order makes it apparent that the court concluded that once authority to search the room itself was found, that authority extended to the interior of the footlocker in the room. This constituted error of law that carried into the order denying suppression.[7]

**6.** The Government seeks to distinguish *Reeves* from this case on the basis that in *Reeves* the consenter was not, as here, the home owner, but was merely a guest in the home along with the search victim. That is a distinguishing fact, but it was not critical to the decision in *Reeves.* In *Reeves,* this Court assumed that the consenter had the same authority that the head of household would have had to permit search of the defendant's room, and held that that authority did not extend to the room or to the bureau drawer within the room because it was known to be "set aside exclusively for [the defendant's] use." *Reeves,* 346 F.2d at 924. Actually, *Reeves* provided a stronger case for finding authority than does this case because there the mother, unlike the mother here, exercised some measure of shared access not only to the room but to the interior of the critical object of search, a bureau drawer, which was not, as was the footlocker here, secured. It is clear that in *Reeves* the Court would have con-

sidered the home owner equally lacking in authority to consent to search of the bureau drawer. Indeed, Judge Bell for the Court said that "only the [search victim] could give constitutionally effective permission for the search without a warrant." *Id.* at 925.

**7.** The court's oral order as set out in the trial transcript does not contain an express conclusion of authority, but it is of course implicit in the ultimate, necessary conclusion that the consent was effective. Neither does the order expressly state any intermediate conclusion that authority to consent to the room search extended to the footlocker, but in total context of the order, this too seems implicit. The decisive error, of course, and the one precisely under review here, is the ultimate conclusion that authority existed to consent to search of the footlocker, by whatever intermediate steps of reasoning it was reached.

On the facts found and those not disputed, Block was a mere guest occupant of the room in his mother's home, and the mother had the normal free access that heads of household commonly exercise in respect of the rooms of family member occupants. She therefore clearly had authority to permit inspection of this room. *United States v. Peterson,* 524 F.2d 167 (4th Cir. 1975). Put in terms of the controlling principles above summarized, she shared access to the room, as room, under circumstances that made it reasonable for the police to believe that she had a right to permit its inspection, and that her son must have assumed the risk that she would do so. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Peterson,* 524 F.2d 167 (4th Cir. 1975). As plain as this appears, it is equally plain that, within these principles, her authority did not extend to the interior of the footlocker within the room; and that of course is the decisive point here. While authority to consent to search of a general area must obviously extend to most objects in plain view within the area, it cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area. The decided cases indicate precisely the contrary: that each such enclosed space stands on its own bottom for this purpose.[8] *See, e. g., United States v. Wilson,* 536 F.2d 883 (9th Cir. 1976) (suitcase in consenter's apartment); *Holzhey v. United States,* 223 F.2d 823 (5th Cir. 1955) (cabinets in consenter's home); *United States v. Blok,* 188 F.2d 1019 (D.C. Cir. 1951) (employee's desk in consenter's office suite). *See also United States v. Poole,* 307 F.Supp. 1185 (E.D.La.1969) (overnight bag in consenter's apartment closet;

consent ineffective although given in victim's presence).

This is as it must be for the protection of one of the primary objects of people's ordinary expectations of privacy. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's "enclosed spaces"—mankind's valises, suitcases, footlockers, strong boxes, etc.— are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently in public places or in places under the general control of another. Indeed, to the sojourner in our midst—all of us at one time or another—the suitcase or trunk may well constitute practically the sole repository of such expectations of privacy as are had.

In addition to this common experience with which they must be charged in assessing the reasonableness of their assumptions and resulting conduct, the police here specifically confronted a secured container that required force to open and a custodian-owner of the general premises who both asserted the absent person's claim of privacy over it and disclaimed for herself any shared right of access to it. All in all, it is difficult to conceive of a real life situation of the general type always faced in these cases wherein the manifestations of retained expectations of privacy by the absent person could be stronger, or the indications of assumed risks of third person permission to inspect, lower.[9]

---

**8.** Obviously not every "enclosed space" within a room or other area—*e. g.,* pockets in clothes, unsecured shoeboxes, and the like—can claim independent status as objects capable of search not within reach of the authorized area search. The rule has to be one of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object: whether it is secured, whether it is commonly used for preserving privacy, etc.

**9.** Circumstances quite unlike those that rightly prompted Judge Russell, speaking for this Court in the *Peterson* case, to point out the inappropriateness of applying the exclusionary rule in situations such as were presented in that case where the record shows reasonable, good faith reliance by the police on the apparent authority of the third person to give consent. *United States v. Peterson,* 524 F.2d at 180, 181 n. 20. This case, to the contrary, is a prime example of the kind of conduct, "at the very least negligent," that justifies—if any still

As a matter of law, on the facts found and not in dispute before the district court, Block's mother had no authority to consent to the footlocker search, and the implicit conclusion by the district court that she had was in error. The evidentiary fruits of this search conducted by state officers and by them turned over to federal officers were accordingly inadmissible against Block in his federal trial. *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1347, 4 L.Ed.2d 1669 (1960).

## III. PREJUDICIAL EFFECT OF ERROR

 Block challenges his convictions on both counts on the basis that the error in admitting the footlocker search evidence was prejudicial as to each. This he is entitled to do notwithstanding concurrent sentences were imposed for the two convictions. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *United States v. Talbert,* 357 F.2d 159 (4th Cir. 1966). We review then to determine whether as to each count separately considered this constitutional error could be declared to be harmless beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and conclude that it was not so harmless as to either.

That it was not so harmless as to the possession count is too obvious to require discussion. That it was not so harmless as to the conspiracy count is almost equally so. If the evidence directly resulting from the search—i. e., that on October 24, 1975, a quantity of heroin was found in a secured footlocker owned by William Block and kept in the room occupied as his regular place of abode—be excluded from jury consideration, there is left in effect the testimony of the two government informants, Davidson and Hudman. Davidson's testi-

mony implicates McGee directly, but Block only inferentially through an association with McGee that is only social except as the testimony of Hudman links them as partners in the particular narcotics conspiracy alleged. Hudman's testimony on this point is limited to reporting a statement allegedly made to him by Block on the occasion of their first and, so far as the evidence disclosed, only encounter during the period of the conspiracy as charged, that Block and McGee were buying heroin from Lochhead (the El Paso source) through an arrangement with one of Hudman's former partners in a drug ring. There is no doubt of the importance of this evidence standing alone as implicative of Block on the conspiracy count. Were we looking at it to judge its sufficiency along with other evidence to support a conviction, we would of course be bound to accept its credibility, and to give it every favorable inference in behalf of the Government. Considering it as we do here to assess whether other improperly admitted evidence also considered by the jury was, in total context, harmless beyond a reasonable doubt, we are not so constrained. For the purposes we assess it now, its sources in the testimony of two admitted drug law violators testifying as Government witnesses, arguably not from motives of high public duty alone; the highly circumstantial nature of all of Davidson's testimony in respect of Block's guilt; and the time lag of two years between Hudman's testimony and the incriminating statement he ascribed (by characterization rather than quotation) to Block, may all properly be taken into account. Having done so, we cannot declare that the much more directly and dramatically implicating evidence procured from the footlocker search was harmless beyond a reasonable doubt to Block on the conspiracy count.[10] The error in admit-

does—application of the exclusionary rule. Here, all the circumstances presented to the police indicated the wisdom, as well as the relative convenience, of seeking a search warrant to inspect the footlocker's interior. *See* Weinreb, *Generalities of the Fourth Amendment,* 42 U.Chi.L.Rev. 47 (1974). While here, as in any case where the exclusionary rule prevents use of highly probative evidence in

respect of reprehensible criminal activity, we may all have deep regrets, it is well also to remember that, viewed in the light of that rule's very deterrent purpose, Block's footlocker is representative, and not unique.

**10.** This assessment is bolstered, though not decisively on the point, by the taint that in any

ting the evidence therefore requires reversal on both counts.

## IV. SUFFICIENCY OF EVIDENCE ON MOTION FOR JUDGMENT OF ACQUITTAL: APPROPRIATE REMAND

■ There remains the question of the appropriate relief upon remand. Block also assigned as error the district court's order denying his motion for judgment of acquittal. He contends that in reviewing this order we should consider only the evidence properly admitted by the district court; that stripped of the footlocker search evidence it was insufficient to withstand the motion; and that accordingly, as his preferred alternative to a new trial, we should reverse and remand with directions to enter judgment of acquittal. This misconceives our function in review. We consider the evidence that the district court considered, and apply to it the same test applicable in the district court. 8A *Moore's Federal Practice* ¶ 29.06 (2d ed. 1976). That test is whether the evidence, considered in the light most favorable to the Government, was sufficient to permit the jury to find guilt beyond a reasonable doubt. *See, e. g., United States v. Sherman,* 421 F.2d 198 (4th Cir. 1970). Applying that test here, it is too clear to require discussion that the evidence

considered by the district court, including that obtained from the footlocker search, was sufficient to support the verdicts of guilty on both counts, and we therefore find no merit in this assignment of error.

Ordinarily we would not consider it necessary on such an evidentiary record to restate these basic rules governing our review process, and would have been content merely to note our consideration and rejection of this assignment of error. We do more here to indicate our consideration of the possibility that *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), decided during the pendency of this appeal, might have altered those rules. *Burks* held, overruling a long standing rule to the contrary,[11] that a court of appeals may only direct acquittal and may not order retrial when it determines that a district court should have granted a motion for acquittal because of insufficiency of the evidence. While the opinion carefully pointed out that retrial remains the appropriate disposition upon reversal solely for trial errors other than rulings on the sufficiency of evidence (specifically giving the admission of evidence as an example, *id.* at 15, 98 S.Ct. 2141, 57 L.Ed.2d 1) it did not speak to the situation presented in a case like this where review of the acquittal motion coincides with a determination that

---

event likely attached to the testimony of both Davidson and Hudman because of its procurement in practically conceded and arguably unattenuated exploitation of the illegal search. *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). On cross examination during the suppression hearing, Special Agent Landrum, although understandably and properly unwilling to make any ultimate concession on the point, did specifically concede that discovery of the heroin in the footlocker "prompted [him] to start contacting El Paso and developing the investigation from that end"; that as a result of his "knowledge of the heroin found in the footlocker, [he] commenced to question . . . Deborah Davidson," and that although he learned of McGee's possible implication from Davidson, he did not learn independently from her of Block's possible implication. [Trial Transcript at 71–74].

11. The rule, originating in *Bryan v. United States,* 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335

(1950), and ambiguously developed in its progeny, *Burks,* 437 U.S. at 12-15, 98 S.Ct. 2141, 57 L.Ed.2d 1, had been that, at least where the defendant on appeal had sought retrial as an alternative to a direction of acquittal, the court of appeals could do what the district court could not do: give the Government a chance to perfect its proof on retrial after finding it insufficient as presented. This was based upon the specific language of 28 U.S.C. § 2106 which in defining the jurisdiction of courts of appeal was thought to permit this disposition in the interests of justice. This rule had come in for serious questioning on double jeopardy grounds, e.g., C. Wright & A. Miller, *Federal Practice & Procedure: Criminal* § 470, at 272, 273; 8A *Moore's Federal Practice,* ¶ 29.09[2] (2d ed. 1976), and it was on this basis that the Supreme Court in *Burks* overruled it in the course of a fundamental reappraisal of the impact of double jeopardy in the mandated retrial situation.

some of the evidence considered by the district court was erroneously admitted. Accordingly it is not directly controlling on the point under consideration. Only by reading into the *Burks* opinion an implication by no means clearly required [12] could it be held also to require a direction of acquittal when evidence other than that held erroneously admitted is determined upon review to have been insufficient to support a guilty verdict. Intimating no view on the merits of such an extension of the specific holding in *Burks* were it to be urged upon us in a proper setting, we simply note that this appeal, where the point has understandably not been raised and briefed, provides no such setting. Accordingly we have not addressed the question of the sufficiency of the remaining evidence that this would force, and for constitutional error in the admission of the evidence seized in the warrantless search, we reverse and remand for further proceedings not inconsistent with this opinion.[13]

REVERSED AND REMANDED.

---

**12.** The traditional justification for considering inadmissible as well as admissible evidence in reviewing acquittal motions has been that the government may have foregone other available evidence in reliance upon obviously stronger evidence admitted by the trial judge and only revealed as inadmissible on appeal. *See, e. g.,* Comment, 31 *U.Chi.L.Rev. 365* (1964). *Burks* of course did not deal with a situation where this justification for a second chance of proof is as appealing. For in the situation where no misplaced reliance on proof admitted on trial is revealed on appeal, the contrary assumption— that the government has already had and given its best shot—is more reasonable. In this lat-

ter situation to permit retrial to perfect proof seems much more likely merely to license the kind of harassment that double jeopardy guards against.

**13.** Noting that this is not a case where it is possible to say with assurance on the record before us that without the inadmissible evidence the Government could not possibly succeed on retrial, a course the Second Circuit was prepared to take in directing acquittal on remand in *United States v. Edmons,* 432 F.2d 577 (2d Cir. 1970). We need now express no view on the propriety of directing acquittal under those circumstances.