**UNITED STATES of America,**

v.

**Maurice WHITFIELD, Defendant.**

**Cr. No. 90–0280–LFO.**

United States District Court, District of Columbia.

Sept. 21, 1990.

Eileen C. Mayer, Asst. U.S. Atty., Washington, D.C., for U.S.

Sidney R. Bixler, Fort Washington, Md., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Maurice Whitfield turned himself in to the Federal Bureau of Investigation after FBI agents investigating a theft of $43,000 visited his home and, upon the consent of his mother to search the house, found $16,000. Defendant moves to suppress evidence taken from his room in his mother's house on the grounds that his mother did not have authority to consent to the search. In addition, he moves to suppress statements made to FBI agents in the absence of counsel. Defendant also moved for a reduction in bond. A hearing on the three motions was held on September 17, 1990. At that hearing, the motion for a reduction in bond was denied and the other two motions were taken under advisement.

On May 25, 1990, the FBI was called to investigate a theft of $43,000 from a vault in a Brinks facility on West Virginia Avenue in Washington D.C. Upon arriving at the Brinks facility, FBI Agent Scott Salter was informed that the theft had taken place on May 23 sometime after 11:00 p.m. He was shown a videotape taken from a security camera in which a person walked through the vault and bent over a bin containing money. The head of security at the facility informed him that the person in the videotape was Maurice Whitfield, an employee on the cleaning staff at the Brinks facility, and that Whitfield had not shown up for work on May 24 or May 25.

Agent Salter and Agent Pauline Roberts, both of whom appeared on the stand to be impressive, committed, young agents, went to Whitfield's home. Agent Salter stated that he went to the house only to interview Whitfield, that he had no plans to search the house, and that he had no sense of urgency in getting to the house. Whitfield was not at home. In his absence the agents talked to his mother, Farrie Whitfield. Agent Salter identified himself and

told her about the theft. He asked her about the house and she told him that it was her house and she lived there with her daughter and two sons.

A threshold question arises as to whether defendant was a tenant and his mother was also his landlady. Agent Salter first testified that Farrie Whitfield told him that her son does not pay rent. When asked by government counsel what she had specifically said, however, he testified instead that she had said that her son didn't have any money. Agent Roberts later took the stand and testified that when asked about rent, the mother shook her head indicating a negative response and stated "get real— that boy's been unemployed." Agent Roberts had no recollection of Farrie Whitfield's answering "no" when asked whether her son paid rent. Farrie Whitfield testified that she did not tell the agents that Maurice did not pay rent and that in fact he did pay rent when he was working. She stated that he had paid $500.00 per month during two previous periods of employment but that at the moment he was only able to pay $100.00 per paycheck. She indicated that $500.00 per month was not the rate of rent but rather that he paid that much while working certain jobs so that the periods in which he paid more would balance the periods in which he was unable to pay as much. She testified that she had told the agents in response to their questions that Maurice had paid her $100.00 very recently and also that Maurice didn't pay a flat rate but only paid rent when he was working. Piecing together the testimony of the agents and the mother establishes that defendant had something in the nature of a landlord-tenant relationship with his mother.

Agent Salter further testified that he had asked if defendant's room was open or locked and that Farrie Whitfield had indicated that it was open. He stated that he would like to conduct a search of the house and Whitfield orally gave her consent to search the room. However, she refused to sign a consent form. In response to questions by the Court, Agent Salter testified that he did not leave the premises to obtain a search warrant because of the risk that defendant might return and remove the money. He also stated, however, that in his experience, a warrant could be obtained in from one to four hours but that it was not possible to obtain a warrant by telephone except in the most extreme circumstances. He considered the possibility that one agent could wait at the house while the other left to obtain a warrant but rejected that idea because he believed the mother's consent was sufficient to validate the search.

After Farrie Whitfield gave her oral consent, the agents went to defendant's room. It was open at the time. They searched defendant's entire room in his mother's presence. They found there no property or clothing of the mother or anyone else. Inside the pockets of several of defendant's jackets hanging in a closet in the room, the agents found packets of bills in Federal Reserve envelopes totaling $16,000.00. Thereafter, according to Agent Salter, Willie Whitfield, Maurice Whitfield's brother, arrived home and instructed his mother to tell the agents to leave. Farrie Whitfield told the agents to leave the premises and they did so, taking with them the money they had found.

On May 28, Farrie Whitfield phoned Agent Salter to tell him that her son wanted to turn himself in. Maurice Whitfield showed up at the FBI office the next morning and was taken to an interview room with Salter and Agent John Kerr and advised of his rights. Defendant told the agents that he wanted an attorney. Agent Salter testified that he told Whitfield that he would like the rest of the money back and that Whitfield responded that the rest of the money was in the house. According to Salter, when asked if there was anything else, Whitfield testified that the money had been too much temptation and described how he took the money. He testified that he, Agent Kerr, and Maurice Whitfield, had visited the house again for the purpose of searching a false ceiling in the basement where Whitfield indicated the money was hidden. At the second visit, Farrie Whitfield gave her consent in writing, but the

search did not uncover any additional money.

Agent Salter testified that, after the statements about the money and after the second search, when the two agents and Whitfield had returned to the FBI office, Whitfield asked whether what he had said would be used against him in court and Salter had answered "probably not." In his Motion to Suppress the Statements, defendant represented that, after requesting an attorney, he was questioned about the theft and asked where the money was, at which point he reiterated his request for an attorney. He claims that the agent told him in response that, since he had requested an attorney, nothing he said could be used against him and his statements would not go out of the room. In his motion, defendant asserts that he then made a statement that he had put the money in a trash bag when he stole it, and taken it home later. However, defendant offered no testimony to prove the agents' alleged assurances that his statement would not be used against him.

### I.

The core question is whether defendant's mother had authority to consent to a search of his room in her house. The Supreme Court has determined that a warrantless search of a person's home does not violate the Fourth Amendment where police officers have obtained the consent of a third party who possesses "common authority" over the premises. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The Court defined common authority as "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* n. 7.

■ Such common authority does not include that of a landlord to consent to a search of a tenant's locked house or apartment. *See Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord without key not authorized to instruct police to enter through unlocked window); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (search invalid where police climbed into landlady's window in rooming house in her presence, spied illegal activity through transom, and entered boarder's room); *United States v. Warner*, 843 F.2d 401 (9th Cir.1988) (landlord with key not authorized to let police into tenant's garage where he had right of access for limited purpose of repairs and mowing lawn); *see also Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk does not have authority to consent to search of guest's room).

■ On the other hand, a joint tenant or spouse who shares a house or apartment has common authority over the rooms in it and may consent to a search of them. *See, e.g., United States v. Harrison*, 679 F.2d 942 (D.C.Cir.1982) (wife had authority to consent to search of boxes in basement); *Wright v. United States*, 389 F.2d 996 (8th Cir.1968) (codefendant who had key to defendant's apartment, stayed there at times and kept some belongings there had authority to consent to search); *Donovan v. A.A. Beiro Constr. Co.*, 746 F.2d 894 (D.C. Cir.1984) (District of Columbia as owner of construction site had authority to consent to inspection by OSHA of all of the open premises despite the explicit denial of consent by one contractor, although contractor might have had exclusive authority over closed areas accessible only to it such as a tool shed.)

More to the point here, several cases explicitly consider a mother's authority over a son's room in her house. In *United States v. Peterson*, 524 F.2d 167 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1966), the Fourth Circuit overturned a district court's *sua sponte* invalidation of a search of a son's room by his mother who owned the house. There the search of the son's bedroom had uncovered a shotgun similar to the one used in the bank robbery under investigation by the police, as well as a grey hat

similar to one worn by one of the robbers, and a twenty dollar bill that had been marked by the bank as "bait money." The court found that there was no evidence that the mother had "relinquished control of the room or her ability to designate what use, if any, could be made of the room." *Id.* at 179. The court noted that the defendant shared the room with two brothers. *Id.* It also noted that it had been reasonable for the police to believe that the mother had authority because a sister who lived nearby had requested that the police wait for the mother's arrival and consent before searching, the mother did not refer to her sons or rooms set aside for their use, and the mother "assumed the absolute authority to speak on the right to search." *Id.* at 180.

In *Maxwell v. Stephens*, 348 F.2d 325 (8th Cir.1965), *cert. denied*, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965), *reh. denied*, 382 U.S. 1000, 86 S.Ct. 532, 15 L.Ed.2d 490 (1965), the court also upheld a search based on consent by a mother to the search of her son's room. There, however, the court noted that "Mrs. Maxwell possessed a proprietary interest in the house; that Maxwell himself only shared a room with his two younger brothers; and that no landlord-tenant relationship existed between Maxwell and his parents." The court further stated that "Mrs. Maxwell had control of the premises, undiminished by any kind of less-than-fee interest possessed by Maxwell. This fact stands out in contrast to the hotel or rental situations." *Id.* at 336–337.

Similarly, in *United States v. DiPrima*, 472 F.2d 550, 551–552 (1st Cir.1973), the court upheld a search based on the consent of a mother to search her son's room. In *DiPrima*, the defendant paid a weekly rent of $10.00. However, the room was shared with a younger brother, the mother used the closet in the room and the defendant was present and within earshot and did not object when the police searched the room. As in *Peterson*, the court indicated that the police should be able to rely on the appearance of authority, as evidenced by, among other things, the mother's use of the closet in the room, the brother's use of the room,

and the defendant's presence during the search. *Id.* In *United States v. Hamilton*, 792 F.2d 837 (9th Cir.1986) the court upheld a mother's authority to consent to the search of a motor home parked on her property where she had entered it several times and it was occupied by teenagers who she was apparently supervising. However, the *Hamilton* court in addition found that the search was valid because the motor home was subject to exceptions for searches of vehicles. *Id.* at 843.

In contrast, the Fourth Circuit held invalid a mother's consent to search a locked footlocker in her son's room. *United States v. Block*, 590 F.2d 535 (4th Cir.1978). In *Block*, the mother admitted the police to the house and consented to the search of the room, where the police saw marijuana and drug paraphernalia in plain view. The police then obtained the mother's consent to search a footlocker of her son's which was kept locked and to which she did not have a key. The officers forced it open and discovered heroin inside. The court held the search invalid, stating that while the mother had the authority to consent to a search of the room, that authority did not extend to every item in the room and that privacy expectations are frequently greater in suitcases, valises, strong boxes and footlockers. In *Block*, as in the instant action, there was a factual dispute as to whether William Block paid rent to his mother.

■ The question remains, thus, whether a son who pays some rent to his mother and does not share a room with siblings or anyone else has an expectation of privacy in the pockets of his jackets hanging in the closet of that room. Though neither the closet nor the pockets of the jackets were under lock and key, as in *Block*, neither did the defendant share the room with brothers as in *Peterson*, *Maxwell*, and *Diprima* nor reside in the house entirely free of charge, as in *Peterson* and *Maxwell*. Furthermore, in none of these cases were there the facts here that the mother refused to sign the written consent form tendered to her by the officials and withdrew that consent when defendant's brother came home and asked his mother to tell the agents to leave.

Moreover, in none of these cases was there evidence as to the commanding presence of the agents or the relative ease with which the agents could have obtained a warrant.

The question involves the extent to which Maurice Whitfield's expectation of privacy can be balanced against the extent and scope of his mother's authority over his belongings. In *United States v. Lyons*, 706 F.2d 321 (D.C.Cir.1983), a defendant who invited two undercover officers into his room for the purpose of drug trafficking was held not to have consented to a search subsequent to his arrest of a coat hanging in an open closet or items in an open suitcase that were not in plain view. The court stated that the question there was whether Lyons "reasonably believed that the room and the closet were not open to the world at large." *Id.* at 326. The court also stated that "an expectation of privacy, strictly speaking, consists of a belief that uninvited people will not intrude *in a particular way*." *Id.* (Emphasis in original.) The government has failed to carry its burden of establishing as a matter of fact and law that any access retained by defendant's mother/landlady or any privacy interest waived extended to the pockets of defendant's jackets in his closet.

Despite the foregoing, the Supreme Court's decision in *Illinois v. Rodriguez*, — U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), requires denial of the motion to suppress. However unreasonable in the abstract the search of the pockets of jackets of defendant in the closet may have been, Agent Salter reasonably believed that defendant's mother had authority to consent to the entire search of defendant's room and all of its contents. Agent Salter could, and did, reasonably infer that the defendant was not paying rent currently and he apparently gave no thought to the possibility that it was defendant's practice to do so when he could afford it. Moreover, there was no square precedent on which to resolve on the spot the close and original question of whether, even if the mother had authority to consent to a search of her son's room, she had authority to consent to a search of the pockets of his jackets in a closet in his room. It was not

unreasonable for the agent to believe, in the circumstances, that she had that authority, even though analysis yields a contrary conclusion. Accordingly, on authority of *Rodriguez*, the accompanying Order denies defendant's motion to suppress the product of the search of defendant's pockets.

## II.

■ Defendant contends that the statements he made in the absence of counsel were offered with the understanding that they would not be used against him. The government concedes that the statements were made after defendant had requested counsel and may not be used in its case in chief. The government argues, however, that the statements were made voluntarily and should be available to the prosecution for purposes of impeachment. *See Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). If the statements were made involuntarily as a result of coercive activity by the police, they would not be available to the government even for purposes of impeachment. *See New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *see also Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (involuntary statements inadmissable only when they result from coercive state activity).

Agent Salter's testimony that defendant did not bring up the question of admissibility until after numerous statements were made and the agents and defendant had visited the house and conducted the second search is uncontroverted. Although the conversation in which the statements were made was initiated by the police, no evidence was presented to demonstrate that defendant was induced to make the statements by promises of immunity. Accordingly, they are admissible for purposes of impeachment. *See Michigan v. Harvey*, — U.S. ——, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

### III.

For the reasons stated herein, an Order will deny defendant's Motion to Suppress Physical Evidence, grant defendant's Motion to Suppress the Statements for the purposes of use in the government's case in chief and deny that Motion for purposes of impeachment, and deny defendant's Motion for Review and Modification of Conditions of Release.