**UNITED STATES of America**

v.

**Maurice WHITFIELD, Jr., Appellant.**

**No. 90–3282.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 13, 1991.

Decided Aug. 9, 1991.

Joseph Petrosinelli, who entered an appearance as Student Counsel pursuant to

Rule 19 of the General Rules of the Court, with whom Stephen H. Goldblatt was on the brief, for appellant.

Jennifer M. Anderson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Eileen C. Mayer, Asst. U.S. Attys., were on the brief, for appellee. Thomas J. Tourish, Jr. and James B. Gunther, Jr., Asst. U.S. Attys., also entered appearances for appellee.

Before EDWARDS, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

A jury convicted Maurice Whitfield, Jr. of stealing $43,000 from a Brinks, Inc., storage facility in the District of Columbia, in violation of 18 U.S.C. § 659. The evidence left no doubt about his guilt. On appeal, Whitfield argues that the district court should have excluded the cash recovered during a warrantless search of his room to which his mother had consented.

At the time of his crime Whitfield was 29 years old. For several weeks he had been working as a janitor for a company that cleaned the Brinks facility. On May 24, 1990, Brinks discovered a bag of cash missing from its vault room. The bag contained $40,000 in twenty dollar bills and $3,000 in tens; the bills were in stacks of 100, wrapped with Federal Reserve bank straps. A videotape from a surveillance camera revealed that at approximately 9:00 p.m. the previous evening Whitfield entered the vault room without being escorted by another employee, as company policy required. He crossed the room twice and, on the second trip, bent down briefly over the cart from which the bag was later discovered missing. Whitfield then left the room, signing out at 9:10 p.m. For the next two days, Whitfield did not show up for work. On the second day of his absence, May 25, the Brinks security manager called the FBI and swore out a criminal complaint against him. Two special agents responded. They interviewed several employees, watched the videotape, and ob-

tained Whitfield's address from the maintenance company. Without seeking an arrest or search warrant, the two agents then drove to the address.

The agents were met at the door by Farrie Whitfield, who identified herself as the defendant's mother. The agents explained that Maurice was suspected of stealing money from the Brinks facility. Mrs. Whitfield told the agents her son was not home and that she did not know when he would return. At that point, the agent-in-charge decided to conduct an immediate search of the defendant's bedroom in view of the likelihood that any stolen cash would be removed if the agents left. Although the agent could have stationed his colleague at the premises while he left to obtain a warrant, he testified that "I didn't want to go back and get a warrant if I could possibly do it on a consent."

To that end, the agents asked Mrs. Whitfield whether the house was hers. She said it was and that she lived there with the defendant, her other son Willie, and her daughter. When the agents asked if the defendant paid "rent," Mrs. Whitfield responded—according to the agents' testimony—with a sarcastic facial expression and the statement that he had no money. Mrs. Whitfield gave a different account: she testified that she told the agents her son paid her when he was working and had recently given her $100. In the past, she said, he had paid her as much as $500 per month, depending on his salary. The district court found that "the testimony of the agents and the mother establishes that defendant had something in the nature of a landlord-tenant relationship with his mother." *United States v. Whitfield*, 747 F.Supp. 807, 809 (D.D.C.1990). The court added, however, that the agent-in-charge "could, and did, reasonably infer that the defendant was not paying rent currently and he apparently gave no thought to the possibility that it was defendant's practice to do so when he could afford it." *Id.* at 812.

One of the agents also asked Mrs. Whitfield whether the defendant's room was open or locked. She said it was open. The

agent testified that his purpose in asking this question was to determine whether Mrs. Whitfield had "free access" to her son's room. He construed her answer to mean that she did, although she did not use those exact words. Whether the agents asked Mrs. Whitfield anything else is unclear. The district court, in its opinion, mentioned only the agents' asking if the room was open or locked. 747 F.Supp. at 809. The transcript of the suppression hearing shows that on cross-examination one of the agents testified that Mrs. Whitfield "indicated" she had "free access to the whole residence, including that bedroom." He then said "My question was, does she have, on a normal basis, does she have free access to the room?"

At any rate, the agents then asked Mrs. Whitfield if they could search the defendant's room, and gave her a consent form to sign. Mrs. Whitfield said that she would consent to a search, but she refused to sign the form. Mrs. Whitfield then took the agents upstairs. The defendant's door was unlocked when the agents entered. Inside, they found bedroom furniture, a television set, and other items apparently belonging to the defendant. In the closet, in the pockets of four coats, the agents discovered eight stacks of $20 bills, wrapped in Federal Reserve straps, totalling $16,000. At this point Willie Whitfield arrived home and told his mother to ask the agents to leave. She did so and the agents departed. Maurice Whitfield turned himself in three days later. When informed of his rights, he requested a lawyer. The agents nevertheless proceeded to question him about the remaining $27,000. (His subsequent confession was therefore not admitted at trial.) Whitfield said the rest of the money was at his mother's house and he agreed to return there with the agents to retrieve it. When they arrived, the agents told Mrs. Whitfield they wanted to search above a false ceiling in the basement. She signed a form consenting to the search, but the agents found nothing. So far as the record discloses, none of the missing cash was ever recovered.

Whitfield moved before trial to suppress the evidence obtained in the search of his bedroom, claiming that his mother did not have authority to consent. The district court thoroughly reviewed the precedents pertaining to a third party's ability to consent to a search, such as *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and *Donovan v. A.A. Beiro Constr. Co.*, 746 F.2d 894 (D.C.Cir. 1984), as well as cases dealing specifically with parental consent to the search of a child's room. *See United States v. Block*, 590 F.2d 535 (4th Cir.1978); *United States v. Peterson*, 524 F.2d 167 (4th Cir.1975), *cert. denied*, 424 U.S. 925, 96 S.Ct. 1136, 47 L.Ed.2d 334 (1976); *United States v. Di-Prima*, 472 F.2d 550 (1st Cir.1973). The court also considered *United States v. Lyons*, 706 F.2d 321 (D.C.Cir.1983), which held that a defendant's reasonable expectation of privacy in the closet of his hotel room had been violated when the police searched a coat hanging in the closet after arresting the defendant for selling drugs. *Id.* at 329. (The court in *Lyons* ordered the suppression of a pistol the police had retrieved from the defendant's coat pocket. *Id.* at 335.) On the basis of this review, the district court concluded that Mrs. Whitfield did not have authority to consent to a search of her son's clothing, but denied the suppression motion on the ground that the agents reasonably believed that she did. For this the court cited *Illinois v. Rodriguez*, — U.S. —, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), which held that a search based on the consent of a third party is reasonable under the Fourth Amendment if the searching officer reasonably believes the third party has authority to consent, even if the facts developed later show that the third party did not have that authority. *Id.*, 110 S.Ct. at at 2801.

 Whitfield's first argument is that the district court misconstrued *Rodriguez*. The Supreme Court, Whitfield argues, held only that the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact, as distinguished from a mistake of law. Whitfield's reading of *Rodriguez* is correct. The Court referred to the "recurring factual question" whether a third party has au-

thority to consent to a search (110 S.Ct. at 2800) and held that the reasonableness of an officer's determination of the authority of a consenting party must be judged by "the *facts* available to the officer at the moment...." *Id.* at 2801 (emphasis added), quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). *Rodriguez* thus applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be.

In this case, it is not clear whether the district court thought the agents had the facts straight but were confused about the law, or whether it thought the agents had operated under some factual misconception. The district court sustained the search because:

> there was no square precedent on which to resolve on the spot the close and original question of whether, even if the mother had authority to consent to a search of her son's room, she had authority to consent to a search of the pockets of his jackets in a closet in his room. It was not unreasonable for the agent to believe, in the circumstances, that she had that authority, even though analysis yields a contrary conclusion. Accordingly, on authority of *Rodriguez*, the accompanying Order denies defendant's motion to suppress the product of the search of defendant's pockets.

747 F.Supp. at 812. We find it unnecessary to decide whether this passage carries the meaning Whitfield ascribes to it. Even if the district court meant to apply *Rodriguez* only to some unspecified factual mistake by the agents, the Supreme Court's decision does not assist the government in its effort to defend this search.

As a factual matter, the agents could not reasonably have believed Mrs. Whitfield had authority to consent to this search. The agents simply did not have enough information to make that judgment. Under *United States v. Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, "the authority which justifies third-party consent" rests on "*mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their numbers might permit the common area to be searched" (emphasis added). We will assume the agents' questioning of Mrs. Whitfield, sparse as it was, provided a sufficient basis for their believing she "generally" had "joint access" to her son's room. The room was not locked, at least when the agents were there, and Mrs. Whitfield lived in the house. If "access" carries its common meaning, Mrs. Whitfield had it, as did the defendant—both *could* enter his bedroom.

Mrs. Whitfield's ability, or even legal right, to enter simply qualified her as a person who, under *Matlock*, could give consent to a search of property subject to her "mutual use." But whether she had "mutual use" of the room or the closet containing the defendant's clothing could not be determined from anything the agents asked. The bedroom itself was not a "common area" and the agents had no grounds for believing otherwise. *Compare A.A. Beiro Constr. Co.*, 746 F.2d at 899. The agents never asked Mrs. Whitfield whether she cleaned her son's room, visited with him there, stored any of her possessions in the room, watched television there, or made use of the room at any time for any purpose. The suppression hearing shed no light on the actual circumstances. While testifying as a government witness, Mrs. Whitfield responded to a leading question by saying the defendant cleaned his own room. The court sustained a defense objection. The prosecution did not follow up and made no attempt to discover anything further on the subject.

Officers may of course proceed on the basis of the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). They may assume that a husband and wife mutually use the living areas in their residence and have joint access to them so that either may consent to a

search. *See, e.g., United States v. Harrison,* 679 F.2d 942, 946–47 (D.C.Cir.1982); *United States v. Hendrix,* 595 F.2d 883, 885 (D.C.Cir.1979). When a minor child's room is involved, agents might reasonably assume that the child's mother, in the performance of her parental duties, would not only be able to enter her child's bedroom but also would regularly do so. But we are aware of no basis for such an assumption when the child is, as here, 29 years old. The agents in this case had no way of knowing whether parents usually do not permit their adult sons and daughters to have exclusive use of the rooms they occupy and they made no effort to find out whether Mrs. Whitfield had this or some other arrangement with her son.

It is the government's burden to establish that a third party had authority to consent to a search. *Rodriguez,* 110 S.Ct. at 2797. The burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to "mutual use" by the person giving consent, "then warrantless entry is unlawful *without further inquiry,*" *Rodriguez,* 110 S.Ct. at 2801 (emphasis added). *See also* W. LaFave, Search and Seizure § 8.3(g), at p. 267 (1987).

The government has not carried its burden in this case. The agents' superficial and cursory questioning of Mrs. Whitfield did not disclose sufficient information to support a reasonable belief that she had the authority to permit this search. The agents could not infer such authority merely from her ownership of the house. "Common authority is, of course, not to be implied from the mere property interest a third party has in the property." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; *United States v. Chaidez,* 919 F.2d 1193, 1201 (7th Cir.1990). The agents could not, for the reasons we have given, draw such an inference from the parent-child relationship or from the fact that the room was unlocked, which established only joint access, not mutual use as *Matlock* requires. The remaining piece of information—that defendant had led his mother to think he had no money for rent—did not supply the missing element of mutual use. A landlord-tenant type of arrangement between a parent and an older child might indicate that the child has been given greater autonomy in the house, that his room is his private enclave, a place no one else may enter without his permission. But "rent" or, perhaps more accurately, contributions toward household expenses, cannot be decisive. An adult offspring who pays nothing to his parents might nevertheless enjoy exclusive use of a room within the home, while one who does make payments may have a quite different arrangement. As we have said, under *Matlock* and *Rodriguez* agents faced with such situations must make further inquiries before engaging in warrantless searches. If the information gleaned from those inquiries is insufficient to establish apparent authority, the Fourth Amendment demands that the agents procure a warrant. The agents did not do so here, and the search violated the Fourth Amendment.

*Reversed and remanded.*